PER CURIAM:
Plaintiff-appellants, the family of Diana Simpson, challenge the district court’s summary judgment dismissing . their § 1983 lawsuit claiming that Young County violated Mrs. Simpson’s constitutional rights when she died in the county jail from a probable suicide-caused drug overdose the evening after she was arrested for public intoxication. The family asserts that the County is liable for the acts and omissions of its personnel who arrested and jailed Mrs. Simpson. The family also asserts that unconstitutional conditions of pretrial confinement, arising from the County’s policies and procedures, caused Mrs. Simpson’s death. For the following reasons, the judgment of the district court is AFFIRMED regarding the claim that the jailers’ acts and omissions caused Mrs. Simpson’s death and render the County hable; the judgment is VACATED and REMANDED for further proceedings as to whether there is a genuine issue of material fact that the County’s policies created unconstitutional conditions of confinement that caused the decedent’s death.
BACKGROUND
Mrs. Simpson struggled with depression and a year before her death had attempted suicide. In the weeks leading up to her death, she told her husband, Edward Simpson, that if she were to attempt suicide again, she would withdraw cash from the ATM, use the cash to check into a motel so that her presence would not be traceable, and then would overdose on pills.
*277 On May 18, 2015, Mr. Simpson noticed a cash withdrawal when reviewing his bank account online. The night before, Mrs. Simpson had worked the nightshift at Stephens Memorial Hospital, where she often slept after her shift because her home was 75 miles away. After calling his wife and failing to get an answer, Mr. Simpson called the hospital to inquire if his wife was sleeping there and learned that she had left after her shift. Mr. Simpson called numerous local law enforcement agencies to report his wife missing and at risk for suicide. He placed a photo of his , wife’s vehicle on Facebook asking anyone who saw it to contact the authorities.
Alerted by a woman who saw the Pace-book plea and recognized Mrs. Simpson’s vehicle parked on a roadside in Graham, Texas, police officer Kyle Ford found Mrs. Simpson asleep in the driver’s seat about 5 p.m. on May 19. In questioning her, Ford’s arrest documents state that he observed that Mrs. Simpson’s speech was slurred, she responded slowly, and she had a hard time keeping her eyes open when speaking. He asked Mrs. Simpson whether she had consumed alcohol or taken any medication. She replied that she had a drink the night before to help her sleep but at that point denied ingesting medicine. Mrs. Simpson also denied having diabetes or other medical 'conditions. Officer Moody, who assisted Ford, corroborated her intoxicated behavior.
Ford called Young County medics to evaluate Mrs. Simpson. After an examination, medic Jared Cook found a slightly elevated blood pressure and slightly low pulse. Mrs. Simpson confirmed to him that “she normally has high blood pressure and a low pulse.”- Her blood sugar level was normal, and there were no symptoms of heat stroke or dehydration. A medic asked her whether she was depressed or wanted to hurt herself; Mrs. Simpson replied “no” to both questions. Cook described Mrs. Simpson as “impaired but not altered.”
Seeing a pill bottle on the passenger floorboard of Mrs. Simpson’s car, Ford obtained her consent to search the vehicle, and she walked unsteadily toward the ambulance to await the search. She stated, however, that her hip had arthritis. She then told Cook that she had.-taken two Benadryl earlier in the day to help her sleep. Mrs. Simpson dozed off while Cook attempted to conduct a horizontal gaze nystagmus test.[1] Simpson told Cook she did not want to be taken to the hospital.
Meanwhile, in her purse, Ford found a substantial number of partially empty'blister packs of medication and showed them to a medic. Several open beer cans littered the back seat. Ford took photographs, collected, and inventoried the evidence. When Ford asked Mrs. Simpson again how much of the medication she had taken, Mrs. Simpson replied that she took all that was missing from the packages that morning.[2] She also confided that she had drunk alcohol the previous night “to help her sleep.” Ford then asked her if she was trying to hurt herself but she responded that she was not. She declined his offer to go to the hospital.
*278 Ford arrested Mrs. Simpson for public intoxication shortly after 6 p.m. and took her to the Young County Jail.
Mrs. Simpson arrived'at the jail about 6:30 p.m. Jailer Rich filled out but did not complete Mrs. Simpson’s intake medical screening form. She checked a box “negative” for any behavior or conditions indicative of suicide. In a sworn declaration, Ms. Rich testified that Mrs. Simpson was “responsive, talking coherently and providing satisfactory answers” to her questions during the intake. Mrs. Simpson also indicated, in response to screening form questions, that she was not depressed, not thinking about killing herself;- and had never attempted suicide. Mrs. Simpson walked unassisted to a female holding cell to sleep before finishing the booking process.
- During the book-in process, no County employee ran- a Continuity of Care Query (CCQ), a Texas law enforcement information-sharing service that provides real-time identification of individuals who have received State-funded mental health services within the past several years.
How frequently jail staff checked on Mrs. Simpson in the holding cell is disputed. There is nevertheless evidence that another female detainee was placed in Mrs. Simpson’s cell during the evening. And around midnight, when Officer Post arrived at the jail, Deputy Wacaster walked Officer Post to a holding cell and told him to look through the cell window. Officer Post saw Mrs. Simpson lying on the floor, wearing nothing but a tee-shirt.
In the meantime, after learning that his wife had been arrested, Mr. Simpson called the Graham police station and requested that they take his wife to the hospital. He told the officer she-was a suicide risk, but he did not say that she might have taken drugs or overdosed because he did not know that. He was informed that she had been evaluated by medical personnel and refused to go to the hospital. He called the jail once before Mrs. Simpson arrived there and was told that an ambulance was there at the scene, and he related that she had a BOLO (“be on the lookout”) report for the safety of her life. In a later call to the jail, he says he “begged” them to take his wife to the hospital. Finally, in a call to the jail about 8 p.m., Mr. Simpson requested that the Texas Department of Mental Health and Mental Retardation (“MHMR”) assist -his wife, but was told that MHMR would not see her until she was sober. The jail employee who took this call stated that Mrs. Simpson was just drunk and- needed -to sleep it off.
“About 2:40 a.m., Ms. Rich entered the holding cell to' finish the book-in process and found Mrs. Simpson unresponsive. Paramedics took her to the hospital where she was pronounced dead. An autopsy identified the cause of death as mixed drug intoxication, and the manner of death was found to be consistent with and highly suspicious of suicide.
Mrs. Simpson’s husband, and children (collectively, “plaintiffs”), sued individually and as representatives- of the estate of Diana Simpson, contending that Young County violated 42 U.S.C. § 1983 and the Texas Tort Claims Act. The district cojirt granted the defendant’s motion for summary judgment, dismissing all claims. Plaintiffs appeal only the dismissal of their § 1983 claim.
STANDARD OF REVIEW
This court reviews a district court’s grant of summary judgment de novo. Kemp v. Holder, 610 F.3d 231, 234 (5th Cir. 2010). Summary judgment is granted when “there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.” *279 Id. (citing Fed. R. Civ. P. 56(a)). The “burden of production at trial ultimately rests on the noñmovant” and the movant must merely show an “absence of evidentiary support in the record for the nonmovant’s' case.” Cuadra v. Houston Indep. Sch. Dist., 626 F.3d 808, 812 (5th Cir. 2010). The nonmoving party must then come forward with specific facts showing that there is a genuine issue for trial. Id. And though we draw justifiable inferences in favor of the nonmovant, the nonmovant must put forward sufficient evidence to enable us to draw this inference. State Farm Life Ins. Co. v. Gutterman, 896 F.2d 116, 118 (5th Cir. 1990). There is “no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party.” Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249,106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986). This court may affirm a grant of summary judgment on any grounds supported by the record and argued in the district court. Campbell v. Lamar Inst. of Tech., 842 F.3d 375, 378 (5th Cir. 2016).
DISCUSSION
Plaintiffs’ § 1983 case invokes alternative theories for the County’s liability for the death of Mrs. Simpson: the unconstitutional “conditions of confinement” at the Young County Jail, or .the “episodic acts and omissions” of jailers. Hare v. City of Corinth, Miss., 74 F.3d 633, 644-45 (5th Cir. 1996) (en banc). We accept plaintiffs’ characterization of the case as concerning whether Mrs. Simpson exhibited serious medical needs, not simply whether she was suicidal upon admission to the jail.[3] The “unconstitutional conditions” theory rests on the idea that the County has imposed what amounts to punishment in advance of trial on pretrial detainees, and it requires no showing of specific intent on the. part of. the County. The “episodic acts and omissions” theory, in contrast, requires a finding that particular jailers acted or failed to act with deliberate indifference to the detainee’s needs. Normally, episodic acts liability falls not on the County as employer, but on the individual employees for their particular acts. See Shepherd v. Dallas Cty., 591 F.3d 445, 452 (5th Cir. 2009). In this case, plaintiffs are attempting to create genuine issues of material fact concerning both unconstitutional conditions of confinement and episodic acts or omissions that allegedly flowed- from the- County’s unconstitutional policies or lack of policies.
Because, the district court focused only on the plaintiffs’ claim that, episodic acts and omissions of the jail personnel could be imputed to the County, it did not analyze their unconstitutional conditions of confinement claim at all. In deference to the. trial court’s responsibility to review the record in the first instance, we vacate and remand for its consideration whether there is any genuine issue of material fact that Mrs. Simpson was subjected to the County’s unconstitutional conditions of confinement.
The plaintiffs’ theory of episodic acts and omissions, on the other hand, was squarely rejected by the district court on summary judgment and is poised for appellate review.
*280 A government entity may incur Section 1983 liability for episodic acts and omissions injurious to a pretrial detainee if plaintiffs first prove that County officials, acting with subjective deliberate indifference,-violated her constitutional rights; and plaintiffs then establish that the County employees’ acts resulted from a municipal policy or custom adopted with objective indifference to the detainee’s constitutional rights. Hare, 74 F.3d at 649 n.4; Lawson v. Dallas Cty., 286 F.3d 257 (5th Cir. 2002) (jail medics’ treatment of paraplegic inmate, leading to decubitus ulcers, was subjectively deliberately indifferent, - and County was liable for multiple policies indicating objective indifference to serious medical needs).
Plaintiffs’ claim fails on several fronts. First, the principal evidence of the alleged “policy or custom” arises from the treatment of Mrs. Simpson, that is, from this single case. To be unconstitutional, however, a municipal entity’s policy that derives from custom or practice must be “so common and well settled as to constitute a custom that fairly represents municipal policy.” Webster v. City of Houston, 735 F.2d 838, 841 (5th Cir. 1984) (en banc). Further, “[a] municipality is almost never liable for an isolated unconstitutional action on the part of an employee.” Peterson v. City of Fort Worth, 588 F.3d 838, 847 (5th Cir. 2009). Plaintiffs offered no evidence about the alleged maltreatment of any other detainees at Young County’s jail.
Second, regardless whether there was sufficient evidence to create a genuine, material fact issue that the failure of jailers to “complete” Mrs. Simpson’s intake screening questionnaire and to request a CCQ reflected County “policies or customs,” these are matters of file documentation. There is no proof that any such alleged deficiencies in jail procedures were causally linked to Mrs. Simpson’s death under the circumstances of this case. The intake questionnaire was substantially completed, in any event, and there is no evidence that Mrs. Simpson’s name would have appeared on a CCQ inquiry.
Third, her treatment by the employees of the County did not indicate subjective deliberate indifference. Deliberate indifference is an extremely high standard to meet. Stewart v. Murphy, 174 F.3d 530, 534 (5th Cir. 1999). To demonstrate deliberate indifference, a plaintiff must show that public officers were aware of facts from which an inference of a substantial risk of serious harm to an individual could be drawn; that they actually drew the inference; and that their response indicates subjective intention that the harm occur. See Thompson v. Upshur County, 245 F.3d 447, 458-59 (5th Cir. 2001). Here, Mrs. Simpson was questioned extensively about potential' suicidal tendencies; she never admitted overdosing; the medics examined her and found normal vital sign's and, essentially, nó medical emergency; she underwent intake screening with only an indication of intoxication. The officers and jail personnel had information about Mrs, Simpson from several sources: the EMTs, Mrs. Simpson herself (repeatedly denying the need to go to the hospital or desire to kill herself to two arresting officers, two EMTs, and Officer Rich); their own observations; and her husband. Their individual actions may have amounted to negligence, even gross negligence, but that is not sufficient to create a genuine issue of material fact concerning deliberate indifference as to any one of them, much less a systemic failure attributable to the County.
Fourth, liability cannot.be imposed on the County for any failures by Sheriff Walls in this case, because he was not involved in and had no knowledge of Mrs. Simpson’s situation until after her death. *281 Supervisors cannot be held liable for constitutional violations committed within the jail if they had no personal-involvement. Thompkins v. Belt, 828 F.2d 298, 303 (5th Cir. 1987). And notwithstanding his status as a County policymaker, the County could not be liable absent the Sheriffs direct participation.[4]
Contrary to plaintiffs’ theory, a plaintiff cannot bootstrap government entity liability from the individual failures of employees because there is no respondeat superi- or liability under Section 1983. Monell v. Dep’t of Soc. Servs. of City of N.Y., 436 U.S. 658, 691, 98 S.Ct. 2018, 2036, 56 L.Ed.2d 611 (1978); Hicks-Fields v. Harris Cty., Texas, 860 F.3d 803, 810-811 (5th Cir.2017). This court’s decision in Shepherd is distinguishable because his claim was not based on failures of individuals but implicated “the jail’s system of providing medical care to inmates with chronic illness.” 591 F.3d at 453 (“Shepherd’s claim, by contrast, does not implicate the acts or omissions of individuals but the jail’s system of providing medical care to inmates with chronic illness”).[5]
CONCLUSION
The Constitution does not require that officers always take arrestees suspected to be under the influence of drugs or alcohol, or reported by relatives to be at risk, to a hospital against their wishes. Grayson v. Peed, 195 F.3d 692, 696 (4th Cir. 1999). Mrs. Simpson’s decision to take her own life is tragic. The County, however, cannot be held responsible for fatal decisions she made that were, under all the circumstances, not obvious to government employees.
The judgment is AFFIRMED to the extent it rejected plaintiffs’ episodic acts and omissions claim; VACATED and REMANDED for consideration in the first instance of plaintiffs’ unconstitutional conditions of confinement claim'.

. A horizontal gaze nystagmus test is a standardized field sobriety test often used to determine whether an individual is under the influence of alcohol. The test.ascertains the extent to which a person's eye can follow a moving object slowly with riiinimal jerking when the subject is intoxicated. Babers v. City of Tallassee, Ala., 152 F.Supp.2d 1298, 1302 (M.D. Ala. 2001). As one becomes more impaired, one’s inability to track slowly the moving object becomes more pronounced, Id.

. Mrs. Simpson’s autopsy report, however, did not show traces of these particular medications.

. The district court incorrectly maintained that plaintiffs may only bring a "pretrial detainee suicide case” trader a theory of episodic acts or omissions for which individual defendants, not the county, ordinarily bear liability. Shepherd, 591 F.3d at. 452-53. This case is not a classic pretrial detainee suicide case because Mrs. Simpson did not commit suicide while detained. But plaintiffs- can bring a pretrial detainee case, whether or not it ultimately involves suicide, under alternative theories of episodic acts and omissions by individual defendants or unconstitutional-conditions of confinement. Id. at 453 n.1.

. Of course, if the Sheriff w.as responsible for alleged “unconstitutional conditions of confinement,” that would be a different issue, which the district court must address on remand.

. Plaintiffs also contend that the County may be liable for unconstitutional failure to train its employees, but they offered no evidence relevant or sufficient td creáte a fact issue on this theory.