# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**FILED**

April 22, 2020

Lyle W. Cayce
Clerk

No. 19-10222

NICHOLE SANCHEZ; CASY SIMPSON; EDWARD LAROY SIMPSON, II, Individually and as the Representative of the Estate of Diana Lynn Simpson,

Plaintiffs - Appellants

v.

YOUNG COUNTY, TEXAS; YOUNG COUNTY SHERIFF'S DEPARTMENT,

Defendants - Appellees

Appeal from the United States District Court
for the Northern District of Texas

Before CLEMENT, HIGGINSON, and ENGELHARDT, Circuit Judges.

EDITH BROWN CLEMENT, Circuit Judge:

Diana Simpson died of a drug overdose while she was a pretrial detainee at the Young County Jail. Her family (Plaintiffs) sued Young County for her death under 42 U.S.C. § 1983. We previously affirmed summary judgment for the County in part, dismissing Plaintiffs' episodic-acts-or-omissions theory of liability. *Sanchez v. Young County (Sanchez I)*, 866 F.3d 274, 280 (5th Cir. 2017). But we remanded for the district court to evaluate Plaintiffs' conditions-of-confinement theory in the first instance. *Id.* at 279. The district court granted summary judgment for the County on that theory, too. Plaintiffs appeal. We reverse in part and remand.

No. 19-10222

I.

Simpson's death was a suicide. This was not her first attempt. After her previous attempt, she told her husband that, were she to try again, she would get cash from an ATM and go to a motel so that he could not find her. Once there, she would overdose on pills. So her husband was understandably concerned when, a few weeks after Simpson said this, he noticed a cash withdrawal from his bank account.

He tried to contact Simpson, but she did not respond. He called the hospital where she worked, but she was not there. When she did not report for her shift the next evening, he called law enforcement and filed missing-person and be-on-the-lookout reports. Eventually, someone saw her car on the side of the road in a nearby city and called the police.

Police officers found Simpson asleep in her vehicle. They woke her and noticed that her "speech was slurred, that she was slow on her answers, and that [she was] talking real[ly] quiet[ly]." She "had a hard time keeping her eyes open to talk," "kept leaning her head back against" the headrest, and "had a hard time getting her [license] out of her wallet that was in her lap" and "trying to get a cup of water to her mouth" for a drink. She denied being diabetic or having any medical conditions. She initially denied taking any medications and said that she had something to drink the previous night to help her sleep. The officers called EMS to come evaluate her. EMS medics determined that her vitals were "fine" and that her blood sugar was normal, but noted that her blood pressure was high and her pulse was low.

According to the officers, she "was unsteady on her feet and almost fell down"; she "had to be assisted while walking and could not stand on her own." With Simpson's permission, they searched her car and found beer cans—some empty—and empty blister packs for twenty-four pills. These pills included antihistamines, muscle relaxers, and antipsychotics. They asked her how

2

much she took. Her answer: "all of it." She denied to officers that she was trying to hurt herself and declined to go to the hospital. But she told one of the medics that she was trying to kill herself.

The officers determined that Simpson, if left alone, was a danger to herself or to others, "due to her being on some type of medication," so they arrested her for public intoxication and took her to Young County Jail.

When Simpson arrived, jailers started the book-in process. They never finished. On the suicide-screening form, they completed only the detainee-question portion; left undone was the portion for jailer observations. Completing that form is mandatory, but because they thought that Simpson was drunk, they put her in a holding cell at 6:30 p.m. to "sleep it off." Several jailers stated that this and other book-in forms, such as a computer-based medical intake form, did not have to be completed at intake; they could be completed later. Jailers also stated that they could review the state-mandated Continuity of Care Query results later. *See* 37 TEX. ADMIN CODE § 273.5(b), (c). The Query results show if a detainee has received state-provided mental-health services.

The Query results confirmed that Simpson had received such services, but jailers did not review this information. Nor did they consider the be-on-the-lookout report, the arrest report, the officers' statements, or that officers brought to the jail a bag of the empty pill packs—all of which suggested that Simpson had taken medication and could be in danger. Instead, jailers relied on Simpson's responses to their questions and put on her screening form that she was not on medication.

Simpson's husband called the jail three times to check on her. But jailers apparently did not consider the information that he provided when determining whether Simpson needed medical care. In his first call, before she arrived at the jail, he told jailers that she had been missing for two days and

was suicidal. In his second call, after she had arrived, he again said that she was threatening suicide and asked that the jail get her help. That jailer did not think these warnings were relevant because, according to him, the jail would not contact mental-health services unless Simpson was sober and attempted or admitted to attempting suicide at the jail. Her husband's third call was after she died.

When a jailer returned to complete the book-in process at 2:55 a.m., Simpson was on the cell floor, unresponsive and naked from the waist down. She had been lying there, half-naked, almost the entire night. Jailers took her to the hospital where she was pronounced dead. Her cause of death was "mixed drug intoxication."

While Simpson was in the cell, jailers performed periodic cell checks. The only way to see Simpson in the cell during these checks was to slide open an observation window on the cell door. These cell checks were logged using an electronic wand system. According to the cell-check logs, jailers checked on Simpson every 25 minutes between 6:52 p.m. and 2:54 a.m., and two jailers swore that the logs were accurate. But a subsequent Texas Ranger investigation revealed at least four discrepancies with the logs and video recordings of Simpson's cell. First, the jail somehow lost the recording for 7:52 p.m.–2:00 a.m. The investigating Texas Ranger made several unsuccessful attempts to obtain this missing recording—the jail administrator sent CDs supposedly containing the missing recording several times, but none covered the missing six-hour window. The administrator's explanations for these mix-ups were that he downloaded the wrong day, then that the system had been upgraded, and then that the video was inexplicably gone. The company that performed the upgrade, however, stated that the upgrade would not affect the recording. Second, the recordings that *are* available show that no one checked on Simpson between 6:52 p.m. and 7:52 p.m., despite cell-check

logs showing otherwise. Third, the recordings show a cell check at 2:45 a.m., but that check was not logged; and the log shows a cell check at 2:18 a.m., but that check is not on the recording. Fourth, the recordings show that, contrary to jailers' statements, Simpson does not move at all after 2:00 a.m.

The County did not conduct its own investigation of Simpson's death, and the County sheriff and jail administrator testified that there were no issues with jail policies and that Simpson's death was a suicide that no one could have detected. No jailers were reprimanded or fired because of Simpson's death.

In the five years before Simpson's death, numerous Texas Commission on Jail Standards reports noted that the County jail failed to document observations of inmates, failed to conduct hourly face-to-face observations, failed to conduct thirty-minute observations of detainees in holding or detox cells, and failed to properly complete intake screening forms. After Simpson's death, Commission reports noted several more potential shortcomings at the jail: failing to notify the magistrate or state mental-health services of inmates who may have mental-health issues, exceeding thirty-minute observation intervals of holding and detox cells, failing to provide "efficient and prompt care to inmates for acute situations," and using observation forms without properly recording times.

Plaintiffs sued the County for Simpson's death under § 1983, alleging Eighth and Fourteenth Amendment violations, and under the Texas Tort Claims Act. After removing the case to federal court, the County moved for summary judgment on all claims. The district court granted the motion. Plaintiffs appealed the dismissal of only their § 1983 claim. We affirmed in part, dismissing Plaintiffs' § 1983 claim to the extent that it was based on an episodic-acts-or-omissions liability theory. *Sanchez I*, 866 F.3d at 280. But we held that the district court erred in failing to consider Plaintiffs' alternative

No. 19-10222

conditions-of-confinement theory and, therefore, remanded for the district court to consider whether a genuine dispute of material fact existed under that theory. *Id*. at 280–81.

On remand, Plaintiffs amended their complaint to allege twelve de facto policies that caused Simpson to be denied her constitutional right to medical care:

a. Defendant Young County had no actual procedure for an assessment or determination of the suicide risk of pretrial detainees, despite the existence of a form, as the de facto policy of Young County officials was not to complete forms. Indeed, the policymaker undertook no efforts to ensure that forms were properly used or filled out thereby providing a de facto policy of not requiring adherence to proper suicide assessment.

b. Defendant Young County systematically ignored the written policies for observation of pretrial detainees posing a suicide risk.

c. Defendant Young County, while having a written policy, did not, in practice, place pretrial detainees deemed a suicide risk in the cells that would allow for maximum visual observation at all times of the safety and welfare of those detainees[.]

d. Defendant Young County's systematic failure to complete the required intake screening instrument resulted in the misclassification and misplacement of highly[ ]intoxicated pretrial detainees in cells that lacked maximum visual observation at all times by Young County Jail staff.

e. Defendant Young County had no enforced policy for the proper monitoring of highly[ ]intoxicated pretrial detainees.

f. Defendant Young County had a longstanding policy, custom, and practice of detaining highly[ ]intoxicated detainees without constitutionally adequate visual surveillance or audio monitoring, which did not allow for maximum visual observation at all times by Young County Jail staff.

g. Defendant Young County chose a policy to only conduct "cell checks" on pretrial detainees every twenty-five minutes. But its policy and custom was to house highly[ ]intoxicated pretrial

detainees in cells that lacked adequate audio and visual surveillance while only checking those cells once every twenty-five minutes and not actually entering the cells to closely monitor the detainees' health and safety. Instead, the jail staff was allowed to use a wand system whereby they could record a "cell check" without ever actually entering the cell.

h. Defendant Young County had no enforced policy to comply with [Commission] requirements related to the [Query] system, including its required training, use and required follow-up.

i. Defendant Young County, by policy, allowed untrained personnel without proper jailer certificates and training to monitor inmates with documented mental and medical issues.

j. Defendant Young County did not adequately train staff on how to properly recognize inmates at risk for overdose, suicide, or to monitor and keep [inmates safe] from overdose or suicide, in violation of [Texas law].

k. Defendant Young County had no alcohol or detox policy for persons with documented coherency issues, documented drug ingestion and documented suicide tendencies such as Mrs. Simpson.

l. Despite a written policy, Defendant Young County failed to have an established procedure for visual, face-to-face observation of all inmates by jailers, in violation of [Texas law].

The County again moved for summary judgment, and the district court again granted the motion. It found that Plaintiffs alleged three types of de facto policies: failure to train, failure to observe detainees, and failure to complete forms and identify suicidal tendencies upon intake. It held that Plaintiffs failed to create a fact issue over whether the alleged training and observation policies were pervasive. The court did find a fact issue over whether the third policy is pervasive, but held that, even if it is, it did not cause Simpson's death. Plaintiffs again appeal.

No. 19-10222

## II.

We review a district court's grant of summary judgment de novo. *Bridges v. Empire Scaffold, L.L.C.*, 875 F.3d 222, 225 (5th Cir. 2017). Summary judgment is appropriate when no genuine dispute of material fact exists and the movant is entitled to judgment as a matter of law. FED. R. CIV. P. 56(a). A genuine dispute of material fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A court must resolve all reasonable doubts and draw all reasonable inferences in the light most favorable to the nonmovant. *See Walker v. Sears, Roebuck & Co.*, 853 F.2d 355, 358 (5th Cir. 1988). A court should enter summary judgment against a party when it has the burden of proof at trial yet fails to establish an element of its case. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). If "reasonable minds could differ" on "the import of the evidence," a court must deny the motion. *Anderson*, 477 U.S. at 250.

## III.

Municipalities can be held liable for violating a person's constitutional rights under § 1983. *See Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 690 (1978). For pretrial detainees, such rights include the right to medical care, *Sanchez I*, 866 F.3d at 279, and the right to be protected from known suicidal tendencies, *Flores v. County of Hardeman*, 124 F.3d 736, 738 (5th Cir. 1997). These procedural and substantive due-process rights stem from the Fourteenth Amendment. *Hare v. City of Corinth*, 74 F.3d 633, 639 (5th Cir. 1996) (en banc) (citing *Bell v. Wolfish*, 441 U.S. 520 (1979)). This circuit characterizes such § 1983 violations of a pretrial detainee's rights as either episodic-acts-or-omissions claims or conditions-of-confinement claims. *Id.* at 644. For both claims, a plaintiff has two burdens: to show (1) that a constitutional violation occurred and (2) that a municipal policy was the moving force behind the

violation. *See Monell*, 436 U.S. at 694. We previously affirmed summary judgment on Plaintiffs' episodic-acts-or-omissions claim in *Sanchez I*, remanding with instructions that the district court analyze whether a genuine dispute of material fact precluded summary judgment on their conditions-of-confinement claim. *Sanchez I*, 866 F.3d at 281. Such claims are challenges to the "general conditions, practices, rules, or restrictions of pretrial confinement." *Hare*, 74 F.3d at 644. The issue is whether the conditions "amount to punishment." *Bell*, 441 U.S. at 535.

To prevail on a conditions-of-confinement claim, a plaintiff must show a condition—a "rule," a "restriction," an "identifiable intended condition or practice," or "sufficiently extended or pervasive" "acts or omissions" of jail officials—that is not reasonably related to a legitimate government objective and that caused the constitutional violation. *Duvall v. Dallas County*, 631 F.3d 203, 207 (5th Cir. 2011) (quoting *Hare*, 74 F.3d at 645)).

Plaintiffs argue that the County has numerous de facto policies that systematically deny medical care to highly intoxicated detainees—e.g., policies of placing highly intoxicated detainees into holding or detox cells to "sleep it off" without proper medical or risk-of-suicide assessment or treatment, of ignoring outside information when assessing a detainee's medical needs, and of failing to train jailers to evaluate detainees' mental-health and medical needs. We find that these policies are best framed as covering three categories: failure to assess, failure to monitor, and failure to train. Plaintiffs argue that the district court erred in finding no genuine disputes of material fact about whether the County had these alleged de facto policies or whether they caused a violation of Simpson's constitutional rights.

A.

Plaintiffs claim that the County denied Simpson adequate medical care by failing to train its jail employees. The district court examined this failure-

No. 19-10222

to-train theory as a conditions-of-confinement claim. *Sanchez v. Young County (Sanchez II)*, No. 7:15-CV-00012-O, 2019 WL 280092, at \*5 n.3 (N.D. Tex. Jan. 22, 2019). It should have examined this theory as an episodic-act-or-omissions claim. *See Flores*, 124 F.3d at 738 (treating the plaintiff's training- and staffing-based allegations as an episodic-acts-or-omissions claim even though the plaintiff attempted to plead them as a conditions-of-confinement claim). Failure-to-train claims are not conditions-of-confinement claims, so dismissing Plaintiffs' claim as such was error.[1]

Nevertheless, we agree that this claim should be dismissed. As the County correctly argues, the claim is barred. We affirmed the dismissal of Plaintiffs' episodic-acts-or-omissions claim in *Sanchez I*. 866 F.3d at 281. The law-of-the-case doctrine therefore prohibits us from reexamining this legal issue. *See United States v. Teel*, 691 F.3d 578, 582 (5th Cir. 2012). And Plaintiffs do not argue that any exceptions to this doctrine apply here. Thus, we affirm the district court's dismissal of Plaintiffs' failure-to-train claim.

B.

The district court dismissed Plaintiffs' claims based on a failure to monitor because it held that Plaintiffs failed to raise a fact issue over whether the County had an "unofficial custom or practice—much less *pervasive* acts— of failing to monitor detainees." The court held that the evidence "plainly contradicts Plaintiffs' characterizations" of the County's practices because Plaintiffs did not offer evidence of other detainees who jailers failed to monitor; the County's use of an electronic wand system did not prove a failure to complete cell checks, and any discrepancies in these checks do not show a de facto policy; and several jailers attested to the existence of written monitoring

---

[1] The district court, for its part, correctly noted that we treat failure-to-train claims as episodic-acts-or-omissions claims. *Sanchez II*, 2019 WL 280092, at \*5 n.3.

policies. It therefore concluded that Plaintiffs' allegations show that the failures were individual ones, not generalized failures that evidenced a de facto policy. This conclusion was error, however, because the court failed to consider all of Plaintiffs' evidence and arguments or to view them in the light most favorable to Plaintiffs.

First, the district court incorrectly faulted Plaintiffs for not "provid[ing] evidence of other detainees [who] jailers failed to observe." Plaintiffs did provide such evidence: the Texas Commission on Jail Standards reports about inadequate detainee monitoring from before and after Simpson's death. Those reports are evidence that jailers failed to monitor other detainees. The district court erred in discounting these reports.

Second, the district court did not even consider evidence that the county policymaker effectively ratified the prior misconduct. In municipal-liability cases, the issue is whether the complained-of "act[] may fairly be said to represent official policy." *Monell*, 436 U.S. at 694. Practices that are "sufficiently extended or pervasive, or otherwise typical of extended or pervasive misconduct," can represent official policy. *Hare*, 74 F.3d at 645. This is because pervasive practices can be evidence that the official policymaker knew of and acquiesced to the misconduct, making the municipality culpable. *See Piotrowski v. City of Houston*, 237 F.3d 567, 578 (5th Cir. 2001).

Showing a pervasive pattern is a heavy burden. *See Shepherd v. Dallas County*, 591 F.3d 445, 452 (5th Cir. 2009). But here, no one disputes that the County sheriff is the relevant policymaker or that he knew about the Commission reports and about the details of Simpson's death. And Plaintiffs argue that even after her death, the sheriff neither punished any jailers involved nor took any action to correct the jail's alleged deficiencies. When the official policymaker knows about misconduct yet allegedly fails to take remedial action, this inaction arguably shows acquiescence to the misconduct

such that a jury could conclude that it represents official policy. *See Duvall*, 631 F.3d at 208–09 (upholding jury finding that a county jail maintained an unconstitutional condition where there was evidence that the county policymaker knew of unconstitutional conditions yet failed to revise its policies); *Grandstaff v. City of Borger*, 767 F.2d 161, 171 (5th Cir. 1985) (holding that, because the city policymaker failed to change policies or to discipline or reprimand officials, the jury was entitled to conclude that the complained-of practices were "accepted as the way things are done and have been done in" that city); *see also Piotrowski*, 237 F.3d at 578 n.18 (explaining that *Grandstaff* affirmed municipal liability because a policymaker's post-incident actions can ratify the prior misconduct). Plaintiffs' evidence therefore creates a fact issue about whether the sheriff acquiesced to the allegedly inadequate monitoring practices.

Third, the district court misunderstood the relevance of evidence about the County's electronic wand system. The court did not consider how discrepancies between cell-check logs and video recordings of Simpson's cell—or the inexplicably missing six hours of these recordings—might affect the jailers' credibility. This evidence might suggest to a jury that jailers were dishonest about how they monitored Simpson and that they tried to cover up their failure to monitor. A jury might then reasonably conclude that, in light of multiple reports that the jail inadequately monitored detainees, such dishonesty and an apparent cover-up is "typical of extended or pervasive misconduct." *Hare*, 74 F.3d at 645; *see Kennett-Murray Corp. v. Bone*, 622 F.2d 887, 895 (5th Cir. 1980) (holding that inconsistent testimony "present[s] questions of credibility which require jury resolution"). This creates a fact issue over whether jailers habitually failed to properly monitor detainees.

Fourth, the existence of written monitoring policies does not, as a matter of law, negate Plaintiffs' above-mentioned evidence that the allegedly

inadequate monitoring practices were pervasive. Indeed, Plaintiffs allege that the jail had a practice of ignoring its written policies. A jury might conclude that such written policies undercut Plaintiffs' failure-to-monitor theory, but the written policies do not compel that conclusion. Plaintiffs' evidence, when viewed in the light most favorable to *them*, creates several disputes of material fact about whether the jail has a de facto policy of inadequately monitoring detainees. Thus, the district court's contrary holding was error.

C.

The district court categorized Plaintiffs' failure-to-assess allegations as making two claims: that the County had a pervasive practice of (1) "misclassifying and misplacing highly intoxicated pretrial detainees in cells that lacked maximum visual observation at all times," and (2) "not ensuring intake assessment forms were properly used or filled out." For the first claim, the court held that Plaintiffs did not provide evidence that the alleged practice of placing intoxicated detainees in holding cells before completing the book-in process is pervasive. For the second claim, though the court found that Plaintiffs created a fact issue over whether jailers "pervasively failed to timely complete suicide screenings and medical intake forms when intoxicated detainees first arrived" at the jail, it held that Plaintiffs failed to create a fact issue over whether this alleged practice caused a violation of Simpson's constitutional rights.

For the first claim, the district court's holding was error. Our holding in an uncannily similar case, *Montano v. Orange County*, 842 F.3d 865 (5th Cir. 2016), makes this clear. One way a plaintiff can prove the existence of a de facto policy is through the "consistent testimony of jail employees." *Id.* at 875. At least three jailers here testified that the jail's protocol with highly intoxicated detainees is to place them in holding cells to "sleep off" their apparent intoxication before completing book-in. For example, (1) the jail

administrator testified that intoxicated detainees are put in holding cells before completing medical and other intake forms; (2) another jailer stated that the "protocol for alcohol or drug detox" is to place detainees "in the holding cell after their initial book-in," allowing "very very drunk" inmates to "sleep for a while"; and (3) the jailer who spoke to Simpson's husband when he called the jail stated that Simpson would have to "sleep it off" before she could receive help or treatment. Indeed, the district court noted this practice, stating that several jailers "testified that medical forms were generally completed later during the book-in process than the suicide screening—after a detainee had time to regain sobriety." This seemingly consistent testimony creates a fact issue over whether the County has a policy of placing highly intoxicated detainees in holding cells to "sleep off" their apparent intoxication without completing book-in procedures like medical and suicide screening. And as we held in *Montano*—a case we affirmed after a full trial—a de facto policy can be established through consistent testimony that a jail has a practice of leaving intoxicated detainees in a cell until they become coherent. *Id.* Thus, given the similarities between these cases, *Montano* controls our holding: consistent jailer testimony about a de facto policy creates a factual dispute that precludes summary judgment.

To the extent the County disputes that this is the jail's detox protocol or that jailer testimony is consistent, resolving those disputes is the province of the jury. Who the jury believes depends on who it finds credible. And credibility determinations are the "purest of jury issues." *Hindman v. City of Paris*, 746 F.2d 1063, 1068 (5th Cir. 1984). The County might show that this alleged "sleep it off" policy is not pervasive, but whether it succeeds is for the jury to decide.

For the second claim, we agree with the district court that the jailers' testimony on whether they "pervasively failed to timely complete suicide screenings and medical intake forms when intoxicated detainees first arrived"

14

at the jail "was strikingly consistent." We therefore also agree that Plaintiffs raised a fact issue over whether this practice showed a de facto policy. But we disagree that Plaintiffs failed to create a fact issue about causation.

The district court concluded that the failure to complete the bottom of the suicide-screening form was not itself a but-for cause of Simpson being denied needed medical care. That might be so, but the court erred in viewing the failure to complete this form in isolation. We do not require a plaintiff to show that a "policy or practice [was] the *exclusive* cause of the constitutional deprivation." *M.D. ex rel. Stukenberg v. Abbott*, 907 F.3d 237, 254 (5th Cir. 2018). Courts "may . . . consider how individual policies or practices interact with one another within the larger system." *Id.* at 255. This is because confinement conditions may be constitutionally inadequate if, when viewed in combination, they have a "mutually enforcing effect that produces the deprivation of a single, identifiable human need." *Wilson v. Seiter*, 501 U.S. 294, 304 (1991).

Plaintiffs allege numerous de facto policies affecting highly intoxicated detainees. For example, policies where jailers are not required to complete suicide- or medical-screening forms, review Query results, or complete the book-in process; a policy of not contacting mental-health services unless the detainee is sober and attempts suicide or indicates on the suicide-screening form that she is suicidal; a policy of accepting detainees arrested for public intoxication without a known blood-alcohol content or further medical clearance so long as they are responsive and not falling down at intake; and a "sleep it off" detox policy that does not include further medical assessments or adequate monitoring. Plaintiffs also allege a policy of disregarding outside information when assessing a detainee's medical needs. The district court did not address these alleged policies, much less consider how they might interact.

No. 19-10222

Reasonable minds might disagree about whether these alleged policies interacted to violate Simpson's constitutional rights. But a jury is "free to choose among reasonable constructions of the evidence." *E.E.O.C. v. Boh Bros. Constr. Co.*, 731 F.3d 444, 452 (5th Cir. 2013) (en banc) (quoting *United States v. Ramos-Cardenas*, 524 F.3d 600, 605 (5th Cir. 2008)). A jury could reasonably conclude that policies where jailers are not required to review Query results or to complete medical forms during the book-in process for highly intoxicated detainees—coupled with a policy of ignoring outside information when assessing medical needs—were a substantial factor in causing Simpson to be denied medical care. One jailer testified that outside information such as missing-person and be-on-the-lookout reports are not considered when assessing an inmate at book-in. Another jailer testified that, when determining whether to contact mental-health services, jail policy is to consider only the Query information, the suicide-screening form, and jailers' own observations, but not outside information from family members or the arresting officer. And even though reviewing the Query results here might have led to Simpson receiving medical care—one jailer admitted that, had she reviewed the Query results, she would have known that Simpson's responses at intake were not true—the alleged practice is to not review those results until completing book-in. That might happen hours later, because the jail's alleged policy is to place highly intoxicated detainees like Simpson into a holding cell to "sleep it off" before completing book-in.

Indeed, viewing the evidence in the light most favorable to Plaintiffs, how jailers could ever detect and treat a suicidal detainee who took a fatal overdose of drugs is unclear. The County's alleged policies are to place seemingly intoxicated detainees in a cell to sober up before they receive further medical screening. In situations like the one here, where a detainee is arrested for public intoxication but her blood-alcohol content is unknown, jailers do

nothing to confirm their suspicion that the detainee is merely intoxicated or to confirm that the detainee is not too intoxicated to safely sleep it off. *Cf. Montano*, 842 F.3d at 879 (faulting the defendant for not addressing why, under its policies, "detainees were expected to heal themselves, particularly when the assumed drug influence was never established"). Unless the detainee decides to abandon her suicide effort, she will sit in a cell to sober up before she can receive further medical screening. But someone who has ingested a lethal dose of drugs, like Simpson did, will never sober up, so she will never get further medical screening.

The County has no apparent process or policy for preventing such an overdosee from successfully killing herself. The jail has no medical staff, jailers do not consider outside information that contradicts what a detainee states at intake, and after intake, jailers do not conduct follow-up assessments. The only follow-up they do is periodic monitoring. And Plaintiffs claim that this monitoring is pervasively inadequate.

Given the different, compounding ways that these alleged policies might interact, a jury could reasonably conclude that they had a "mutually enforcing effect" that deprived Simpson of needed medical care. *Wilson*, 501 U.S. at 304. The district court therefore erred as a matter of law in finding no genuine dispute of material fact about causation.

The County argues, however, that we already decided this causation issue in its favor in *Sanchez I*. That is incorrect. Although we stated that Plaintiffs did not offer proof that failing to complete intake forms caused Simpson's death, we did so when evaluating Plaintiffs' episodic-acts-or-omissions claim. *Sanchez I*, 866 F.3d at 280. We explicitly remanded for the district court to consider Plaintiffs' conditions-of-confinement claim "in the first instance" and, therefore, could not have decided the causation issue for that claim. *Id.* at 281. Moreover, our previous holding addressed whether an

episodic act or omission, in isolation, caused Simpson harm. But as the Supreme Court has held and as our court has confirmed, conditions-of-confinement claims can be based on multiple interacting policies. *Wilson*, 501 U.S. at 304; *Stukenberg*, 907 F.3d at 254. And in any event, Plaintiffs produced additional causation evidence on remand that we did not review in *Sanchez I*. Because a fact issue exists over whether multiple policies interacted to cause constitutionally inadequate confinement conditions, the district court erred in granting summary judgment for the County.

## IV.

Plaintiffs raised several material factual disputes that precluded summary judgment. They offered sufficient evidence to create fact issues over whether the County has de facto policies of failing to monitor and failing to assess pretrial detainees' medical needs, and whether these policies caused Simpson to be denied needed medical care. Plaintiffs' failure-to-train claim, however, was barred. We therefore reverse in part and affirm in part the district court's grant of summary judgment and remand for further proceedings consistent with this opinion.