# United States Court of Appeals
# for the Fifth Circuit

United States Court of Appeals
Fifth Circuit

**FILED**
September 14, 2023

Lyle W. Cayce
Clerk

No. 22-50673

———————

Angela Robinson, *individually*;
Clara Busby,
*as next friend*, guardian, *and parent of and for minors* L.H. *and* T.H.;
Guy Choate, *as independent Administrator of*, *and on behalf of*,
Angela Robinson, *minors* L.H. *and* T.H.,
The Estate of Savion Vashon Hall,
and Savion Vashon Hall's Heirs at Law,

*Plaintiffs—Appellants*,

*versus*

Midland County, Texas; Daniel Stickel,

*Defendants—Appellees*.

———————————————————————

Appeal from the United States District Court
for the Western District of Texas
USDC No. 7:21-CV-111

———————————————————————

Before King, Smith, and Elrod, *Circuit Judges*.

Jerry E. Smith, *Circuit Judge*:

Savion Hall, an inmate at Midland County Jail, suffered severe breathing issues that were known to prison officials. The jail contracted with Soluta, Inc., a private company, for medical services, but Soluta employees failed to provide standard medical care to Hall and fabricated his medical

No. 22-50673

reports. Eventually, Hall required urgent medical attention, but when he asked Daniel Stickel, a prison guard, for help, Stickel followed set protocol: Hall was only supposed to receive "breathing treatments" every four hours; because less than four hours had elapsed since Hall's last treatment, Stickel sent him back to his cell. Eventually, Hall was seen by a doctor, who called Emergency Medical Services ("EMS"). Hall died in the hospital.

Plaintiffs, various relatives and representatives of Hall's estate, appeal the dismissal of his constitutional claims against Midland County and Stickel (plaintiffs having settled with Soluta and several Soluta nurses). Finding no error, we affirm.

I.

According to plaintiffs,[1] Hall was arrested and taken to Midland County Jail on June 21, 2019. He indicated that he had a "breathing problem," had been recently hospitalized for it, and had been prescribed Prednisone. His medical intake form stated that he had asthma and shortness of breath, but, at the time, his oxygen saturation level was 99%.[2] On July 1, Hall was sent to the hospital for asthma-related issues. His discharge instructions stated that he should be returned to the emergency department if his symptoms worsened.

Throughout his time at the jail, Hall was given regular "breathing treatments" that provided medication through a small-volume nebulizer. At the time of Hall's incarceration, Midland County had contracted with Soluta to provide medical services, so Soluta's nurses were responsible for adminis-

---

[1] We take the facts from the complaint, as is appropriate in a motion-to-dismiss posture. *Sewell v. Monroe City Sch. Bd.*, 974 F.3d 577, 582 (5th Cir. 2020).

[2] Oxygen saturation levels measure the amount of oxygen in blood. According to plaintiffs, a normal oxygen saturation level is between 95% and 100%.

2

tering those treatments. Plaintiffs allege that each time Hall received a breathing treatment, the nurse administering the treatment was supposed to listen to his bronchial breath sounds with a stethoscope and measure Hall's oxygen-saturation level with a pulser oximeter before and after the treatment. Those measures were to be recorded in a "flo-sheet," which was intended to track the trends, observe potentially deteriorating conditions, and provide alternative treatment if necessary.

On July 9, Hall was assigned a lower bunk on account of his asthma, but throughout this time, the flo-sheet reflected that his oxygen-saturation levels were healthy and stable.

On the night of July 10, Stickel was on duty. He had a temporary jailer's license, no training, and six weeks' experience. Around 12:30 a.m., Hall approached Stickel and asked to go to medical for a breathing treatment. According to Stickel, Hall was "having trouble breathing" and was "wheezing for air." Stickel states that he called another officer to confirm that Hall could not have a breathing treatment within four hours of his last treatment. That officer allegedly confirmed with an on-duty nurse, who verified the protocol, so Stickel told Hall to return to his cell.

Stickel alleges that throughout the night, he checked on Hall and "saw he was breathing, although with difficulty." He apologized for not allowing Hall to go to medical, and Hall stated that he was going to pass out. The flo-sheet shows—and Stickel's statements imply—that Hall received regularly scheduled breathing treatments at midnight and 4:10 a.m.

At 6:15 a.m., Hall again asked to see medical personnel and told Stickel that he "was not gonna make it." Stickel observed that Hall was struggling to stand and was "close to passing out," but Stickel was "unsure if this would be considered a medical emergency" because Hall was responsive. Stickel called "the special housing unit" to confirm that Hall could not have another

No. 22-50673

breathing treatment, but no one picked up the phone, and Stickel did not try again. Instead, he confirmed that Hall had his inhaler and that the inhaler was sufficiently full, and then sent Hall back to his cell. Stickel never spoke with any medical professional regarding Hall's actual condition that night.

At around 7 a.m., another officer relieved Stickel and told him to send Hall to medical for breathing treatment. The medical staff then sent Hall to the hospital and discharged him from the jail. EMS records showed that Hall's oxygen-saturation level was 77% and that he was "confused and not oriented to time, place, and person." He died in the hospital several days later.

A criminal investigation found serious issues with the medical care that Hall had allegedly received. The Texas Rangers reviewed video evidence showing Hall receiving 60 treatments. But despite the standard protocol, Hall was left to administer his own medication, without any nurse present, eleven times. Forty-three of the treatments were not logged at all. Video evidence showed that nurses consistently recorded oxygen-saturation levels of over 95% but that the nurses rarely used the pulse oximeter or a stethoscope. It is impossible to determine a patient's oxygen-saturation level or lung sounds with those tools, so the Texas Rangers concluded that each nurse had "fabricated vital signs and medical checks with regards to Hall[']s oxygen levels[] and breathing levels."

Plaintiffs therefore allege that Hall consistently worsened throughout his time at the jail because the medical staff failed to provide adequate breathing treatments and fabricated statistics to make him appear healthy. That failure, along with Stickel's failure to summon EMS earlier, led to his death.

Plaintiffs have since settled out of court with both the individual nurses and Soluta. Plaintiffs sued both Midland County and Stickel for deliberate indifference to medical needs under 42 U.S.C. § 1983, but per defen-

dants' motion for judgment on the pleadings, the district court dismissed both suits for failure to state a claim upon which relief could be granted. FED. R. CIV. P. 12(b)(6); FED. R. CIV. P. 12(c). Plaintiffs appeal.

## II.

We review a judgment on the pleadings *de novo*. *Doe v. MySpace, Inc.*, 528 F.3d 413, 418 (5th Cir. 2008). "A motion for judgment on the pleadings under Rule 12(c) is subject to the same standard as a motion to dismiss under Rule 12(b)(6)." *Id.* "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). We "accept all well-pled facts as true" and "constru[e] all reasonable inferences . . . in the light most favorable to the plaintiff." *White v. U.S. Corr.*, *L.L.C.*, 996 F.3d 302, 306–07 (5th Cir. 2021) (citing *Heinze v. Tesco Corp.*, 971 F.3d 475, 479 (5th Cir. 2020)).

## III.

Plaintiffs first question the dismissal of the claims against Midland County alleging deliberate indifference to Hall's medical needs. *See Thompson v. Upshur County*, 245 F.3d 447, 457 (5th Cir. 2001) ("[P]retrial detainees have a constitutional right . . . not to have their serious medical needs met with deliberate indifference."). A serious medical need is "one for which treatment has been recommended or for which the need is so apparent that even laymen would recognize that care is required." *Gobert v. Caldwell*, 463 F.3d 339, 345 n.12 (5th Cir. 2006). Officials violate that right when they ignore, intentionally mistreat, or evince "wanton disregard" for an inmate's serious medical needs. *Id.* at 346 (quoting *Domino v. Tex. Dep't of Crim. Just.*, 239 F.3d 752, 756 (5th Cir. 2001)).

Plaintiffs' claim against Midland County is based on the actions of the

Soluta nurses. But municipalities such as Midland County cannot be held liable unless plaintiffs can show "(1) an official policy (or custom), of which (2) a policymaker can be charged with actual or constructive knowledge, and (3) a constitutional violation whose 'moving force' is that policy or custom." *Valle v. City of Houston*, 613 F.3d 536, 541–42 (5th Cir. 2010) (quoting *Pineda v. City of Houston*, 291 F.3d 325, 328 (5th Cir. 2002)).

According to the complaint, six nurses, on at least fifty occasions, failed to follow the proper medical protocol or deliberately fabricated Hall's oxygen levels. That, allege plaintiffs, is sufficient to show that the employees were acting "pursuant to official government policy." *Guidry v. Broussard*, 897 F.2d 181, 182 (5th Cir. 1990) (per curiam).

A plaintiff can establish a policy "by pointing to similar incidents that are 'sufficiently numerous' and have 'occurred for so long or so frequently that the course of conduct warrants the attribution to the governing body of knowledge that the objectionable conduct is the expected, accepted practice of city employees.'" *Martinez v. Nueces Cnty.*, 71 F.4th 385, 389 (5th Cir. 2023) (quoting *Peterson v. City of Fort Worth*, 588 F.3d 838, 850–51 (5th Cir. 2009)). That knowledge, coupled with a failure to act, can show the existence of a municipal policy. *See Sanchez v. Young Cnty.*, 956 F.3d 785, 791 (5th Cir. 2020) ("[P]ervasive practices can be evidence that the official policymaker knew of and acquiesced to the misconduct, making the municipality culpable.").

But a pattern is not sufficient to establish a policy where the municipality had no knowledge of the pattern. There are no allegations that anyone other than the Soluta employees were aware, or should have been aware, of the nurses' failure to provide adequate medical care.[3] Plaintiffs freely admit

---

[3] The deaths of other inmates are not sufficiently similar to put the county on notice

No. 22-50673

that the nurses' actions were counter to the standard course of treatment and that the nurses "fabricated" Hall's flo-sheet. This implies that neither Soluta nor Midland County[4] knew of the "policy" of failing to follow the proper medical procedures. It would be possible to allege that Soluta had a policy of failing to know what their nurses were doing—but that is not what was pleaded. Instead, plaintiffs' theory hinges entirely on the idea that if enough individuals do something, it becomes the fault of the policymaker. Without a showing of knowledge and acquiescence, such a theory is no more than vicarious liability and cannot survive a motion to dismiss. *See City of Canton v. Harris*, 489 U.S. 378, 385 (1989) ("*Respondeat superior* or vicarious liability will not attach under § 1983.").

## IV.

Plaintiffs also appeal the dismissal of their § 1983 claim against Stickel for deliberate indifference to medical needs.

To survive a motion to dismiss, plaintiffs must plead the two prongs

---

of a failure to provide adequate medical care because only one of them is alleged to have involved a failure to follow proper procedures, and none of the allegations involve fabrication of medical reports. *See Davidson v. City of Stafford*, 848 F.3d 384, 396 (5th Cir. 2017); *see also McCully ex rel. Estate of Davis v. City of N. Richland Hills*, 406 F.3d 375, 383 (5th Cir. 2005) ("Prior indications cannot simply be for any and all bad or unwise acts, but rather must point to the specific violation in question.")

[4] Plaintiffs have asked us to adopt the theory of non-delegable duty. At its core, the theory states that counties have a general duty to provide adequate medical care to inmates, so a county cannot avoid liability for contracting out said duty. *See King v. Kramer*, 680 F.3d 1013, 1020 (7th Cir. 2012); *Leach v. Shelby Cnty. Sheriff*, 891 F.2d 1241, 1250 (6th Cir. 1989)). Therefore, "the private company's policy becomes that of the County if the County delegates final decision-making authority to it." *King,* 680 F.3d at 1020 (citing *Ancata v. Prison Health Servs., Inc.*, 769 F.2d 700, 705–06 (11th Cir. 1985)). In other words, if a plaintiff can show that the company had a given policy, that policy would be automatically attributed to the county. But plaintiffs have not plausibly pleaded that Soluta had a policy of deliberate indifference to Hall's medical needs, so their claims would fail even under the non-delegable duty theory. We therefore pretermit further discussion of it.

of a qualified immunity claim: First, that there has been a violation of a constitutional right, and second, that "the right at issue was 'clearly established' at the time of defendant's alleged misconduct." *Pearson v. Callahan*, 555 U.S. 223, 232 (2009). We have "discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first," *id.* at 236, and we may affirm the district court on any basis supported by the record, *Ferrer v. Chevron Corp.*, 484 F.3d 776, 780–81 (5th Cir. 2007).

To establish deliberate indifference predicated on a delay in medical treatment, plaintiffs must show that the official "refused to treat [Hall], ignored his complaints, intentionally treated him incorrectly, or engaged in any similar conduct that would clearly evince a wanton disregard for any serious medical needs." *Alderson v. Concordia Par. Corr. Facility*, 848 F.3d 415, 422 (5th Cir. 2017) (per curiam) (quoting *Easter v. Powell,* 467 F.3d 459, 464 (5th Cir. 2006) (per curiam)). They must show that Stickel was "aware of facts from which the inference could be drawn that a substantial risk of serious harm exists," that Stickel "actually dr[e]w the inference," and that Stickel "disregard[ed] that risk by failing to take reasonable measures to abate it." *Baldwin v. Dorsey*, 964 F.3d 320, 326 (5th Cir. 2020) (alterations in original) (quoting *Hyatt v. Thomas*, 843 F.3d 172, 177 (5th Cir. 2016)). Plaintiffs must also show that harm resulted from the allegedly deliberately indifferent conduct. *Mendoza v. Lynaugh*, 989 F.2d 191, 193 (5th Cir. 1993).

Assuming the facts as alleged, "Stickel observed Hall experiencing a critical medical crisis over the course of six and a half hours and in response made the conscious decision not to request emergency assistance for Hall unless Hall lost consciousness or stopped breathing." We conclude that Stickel's actions were not so deliberately indifferent to Hall's need for emergency assistance that it amounts to a constitutional violation.

No. 22-50673

We compare *Cope v. Codgill*,[5] *Allen v. Hays*,[6] and *Dyer v. Houston*,[7] each of which found a constitutional violation where an officer failed to call for emergency medical care. In *Cope*, an officer failed to call for medical services when a prisoner strangled himself with a phone cord until he lost consciousness directly in front of the officer's eyes. 3 F.4th at 209. In *Allen*, an officer shot the victim five times at point-blank range, watched him crash his car into a tree, and did not call emergency medical services for six minutes, despite taking the time to call for back-up. 65 F.4th at 747–48. In *Dyer*, we found a plausible constitutional violation would exist if officers "were aware that [the prisoner], in the grip of a drug-induced psychosis, struck his head violently against the interior of [the patrol car] over 40 times" and sustained a traumatic head injury, yet failed to alert anyone. 964 F.3d at 382–83.

We have similarly found a constitutional violation predicated on a failure to provide medical care or assistance where the officer deliberately broke with the standard course of treatment. In *Alderson*, a guard refused to provide prescribed antibiotics and painkillers for his broken ribs[8]; in *Easter*, a nurse refused to provide an inmate's prescribed medication for heart attacks.[9]

But Stickel's situation is distinguishable from those showings of deliberate indifference. Hall was known to have breathing problems, and Stickel knew there was a prescribed course of treatment. Stickel confirmed that Hall had access to his inhaler and was within the bounds of his prescribed breathing treatments. Stickel informed his relieving officer of Hall's situation.

_____

[5] 3 F.4th 198, 209–10 (5th Cir. 2021).

[6] 65 F4th 736, 742 (5th Cir. 2023).

[7] 964 F.3d 374, 381–83 (5th Cir. 2020).

[8] 848 F.3d at 422–23.

[9] 467 F.3d at 463–65.

No. 22-50673

Stickel's actions, though regrettable, are far from the indifference shown in the above-cited cases. Plaintiffs have not plausibly pleaded deliberate indifference predicated on a delay in medical treatment. The dismissal was not in error.[10]

AFFIRMED.

---

[10] To the extent that plaintiffs raise additional § 1983 claims against Midland County predicated on Stickel's actions on the night in question (their complaint alleges policies of understaffing, employing untrained jailers, and instructing jailers not to call for emergency assistance until an inmate was unresponsive), those claims were properly dismissed because Stickel did not violate Hall's constitutional rights. *See Bustos v. Martini Club, Inc.*, 599 F.3d 458, 467 (5th Cir. 2010).

The two other alleged policies (Hall's release from prison when he was sent to the hospital and housing prisoners who needed medical care far from the medical station) have not been shown to the be the cause of any constitutionally recognized harm. We affirm those dismissals as well.