# United States Court of Appeals for the Fifth Circuit

United States Court of Appeals
Fifth Circuit

**FILED**

December 3, 2020

Lyle W. Cayce
Clerk

No. 19-41039

Estate of Rosa Bonilla, by and through her Authorized Representative Zoey Bonilla; Zoey Bonilla, Individually; J.B., Minor; A.B., Minor,

*Plaintiffs—Appellants,*

*versus*

Orange County, Texas; Tiffani Dickerson, LVN; Jenifer Schafer,

*Defendants—Appellees.*

---

Appeal from the United States District Court
For the Eastern District of Texas
USDC No. 1:18-CV-104

---

Before Higginbotham, Jones, and Higginson, *Circuit Judges.*
Edith H. Jones, *Circuit Judge*:

Appellants, the family of a woman who committed suicide while in custody, appeal the district court's grant of summary judgment to Defendants Orange County, LVN Tiffany Dickerson, and corrections officer Jenifer Shafer. Agreeing with the district court that decedent Rosa Bonilla's constitutional rights were not violated, we AFFIRM.

## BACKGROUND

On the morning of February 24, 2017, Rosa Bonilla and her boyfriend Kendrick Soloman were pulled over by law enforcement. A consent search turned up a plastic baggie with multiple Xanax pills, and Bonilla was arrested for the possession of Xanax. Bonilla arrived at the jail shortly before 11 a.m. and was evaluated by appellee Officer Jenifer Shafer in the booking area. Shafer is a corrections officer licensed by the Texas Commission on Law Enforcement who had completed required coursework on suicide detection and prevention before she met Bonilla. Shafer noted that Bonilla was "agitated" when she arrived at the jail, but she quickly became "calm" and "positive." Shafer asked Bonilla a series of questions specified in the jail's intake questionnaire and suicide screening form. Bonilla disclosed that she was bi-polar, suffered from ADHD, and was taking Wellbutrin, Trazodone, and Xanax for these conditions. Bonilla also disclosed that "she had taken Xanax and smoked a little bit of weed" that morning. Finally, Bonilla disclosed some sort of past head injury.

In Shafer's estimation, Bonilla did not appear intoxicated. In response to Bonilla's disclosures, Shafer inquired further about her mental health and Xanax use. Bonilla admitted a history of abusing Xanax. She described herself as suffering from PTSD brought on by sexual abuse she suffered as a child. She also described herself as "depressed" by the death of a friend the previous year. Bonilla denied having ever attempted suicide or having thoughts of suicide since being arrested. She also denied feeling hopeless and explained to Shafer that she would "be leaving [the jail] tomorrow." When asked if "she was going to get sick if she did not have the Xanax," Bonilla responded, "No."

Because Bonilla denied past suicide attempts, having suicidal thoughts, or feeling hopeless, the guidance in the jail's suicide screening form

did not require that she be placed on suicide watch. Shafer observed Bonilla throughout the interview and noted that she did not show signs of depression, erratic behavior, or self-harm such as cuts or ligature marks. Nonetheless, Shafer determined that Bonilla's answers warranted discussion with her supervising officer, Sergeant Cynthia Jowers. After Shafer had this discussion, the officers kept Bonilla in a waiting area for approximately an hour to observe her demeanor. They observed that Bonilla's demeanor was generally "positive" and concluded she did not need immediate medical attention or suicide watch. Shafer then placed Bonilla alone in a holding cell, where she observed Bonilla sleeping in subsequent cell checks.

Around 3:20 p.m., Shafer escorted Bonilla to the visiting room to meet with Kendrick Solomon. Shafer recalls Bonilla being "agitated" on her way to the visiting room, muttering under her breath something to the effect that Solomon had better bail her out. Another corrections officer, Crystal Yocham, was present in the visiting room and reported that Bonilla told Solomon to go to Goodman Bail Bonds and bail her out either that day or first thing the next morning. After the visit, Shafer escorted Bonilla back to her cell and noted that her mood had again improved; she seemed "hopeful." Shafer had no further direct interaction with Bonilla, but she continued to observe Bonilla in the holding cell at thirty-minute intervals until her shift ended at 6:00 p.m.

Around 4 p.m., defendant Tiffany Dickerson, the Licensed Vocational Nurse ("LVN") on duty, reviewed the intake screening form concerning Bonilla. An LVN is "the Texas equivalent of a licensed practical nurse, receives nine months' training in a certificate program, and provides basic medical monitoring under the supervision of physicians or registered nurses." *Montano v. Orange County*, 842 F.3d 865, 870 (5th Cir. 2016). After reviewing Shafer's notes, LVN Dickerson did not believe that Bonilla was a suicide risk, but Bonilla's mental health-related answers required Dickerson

to email an "Inmate Mental Condition Report" to the local magistrate judge and mental health services requesting further evaluation. She did so at 4:10 p.m. Dickerson had also obtained a possible "continuum of care query" (CCQ) match for Bonilla, a search result indicating that Bonilla had previously sought mental health treatment at a state facility. In addition, Dickerson initiated the process of verifying that Bonilla had valid prescriptions. She did not complete the verification process before her shift ended at 6:00 p.m., but she states that she left a note directing the next nurse on duty to finish verifying Bonilla's prescriptions. The LVN on the following shift, Phillip Thompson, was not aware of the verification request and had not verified Bonilla's prescriptions prior to her suicide. Neither Dickerson nor Thompson met with or observed Bonilla. No one at the jail distributed any medications to Bonilla.

At 6:00 p.m. Officer Madeline Lewis relieved Officer Shafer of duty. At the time, Bonilla remained the only inmate in the female holding cell. Shafer indicated to Lewis that she had not had problems with any inmate during her shift and that no one in her care was on suicide watch. Lewis first observed Bonilla during the shift change with Shafer and found her lying on a sleeping mat. She continued to check on Bonilla at least every thirty minutes thereafter. Around 6:40 p.m., Lewis delivered, and Bonilla ate, an evening meal. Lewis spoke with Bonilla during her rounds and recalls that Bonilla had asked to use the phone. According to Lewis, Bonilla never asked for medication or showed any signs of distress. At around 8:40 p.m., Lewis was escorting another inmate to the female holding cell. She looked into the holding cell before unlocking the door and saw Bonilla hanging from a phone conduit with a bedsheet wrapped around her neck. Lewis radioed her supervisors for assistance. Several officers and a nurse arrived at the holding cell and began performing life-saving measures. Bonilla was taken to the hospital and placed on a ventilator. She was declared brain dead two days

No. 19-41039

later on February 26, 2017.

After Bonilla's suicide, the Texas Commission on Jail Standards investigated Bonilla's time at the jail. The Commission noted that although Bonilla's answers at intake presented "numerous flags," jail staff had responded appropriately by notifying the magistrate and mental health services. The Commission concluded that jail personnel had committed "no violation of minimum standards" in their treatment of Bonilla.

A year later, Plaintiffs filed suit in state court against Orange County, Sheriff Keith Merritt, and numerous individual jail employees. After the case was removed to federal court, the district court dismissed several claims and defendants. Summary judgment was sought by the remaining defendants. Addressing the Plaintiffs' § 1983 claims against the County, Officer Shafer, and LVN Dickerson, the district court concluded that Plaintiffs had failed to create a genuine issue of material fact, and that the Defendants were entitled to judgment as a matter of law. The Plaintiffs timely appealed.

## DISCUSSION

This court reviews a district court's grant of summary judgment de novo. *Bridges v. Empire Scaffold, L.L.C.,* 875 F.3d 222, 225 (5th Cir. 2017). Summary judgment is appropriate when no genuine dispute of material fact exists and the movant is entitled to judgment as a matter of law. FED. R. CIV. P. 56(a). A genuine dispute of material fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248; 106 S. Ct. 2505 (1986). A court must resolve all reasonable doubts and draw all reasonable inferences in the light most favorable to the nonmovant. *Sanchez v. Young Cty., Texas*, 956 F.3d 785, 791 (5th Cir. 2020) (quoting *Walker v. Sears, Roebuck & Co.*, 853 F.2d 355, 358 (5th Cir. 1988)).

No. 19-41039

Plaintiffs pursue two types of claims on appeal. As to the individual defendants, they assert liability based on unconstitutional "episodic acts or omissions," and they indict Orange County for unconstitutional conditions of confinement. We address each type.

## CLAIMS AGAINST INDIVIDUAL DEFENDANTS

I. The Episodic Acts or Omissions Claim

An episodic acts or omissions claim arises where "the complained-of harm is a particular act or omission of one or more officials." *Flores v. Cty. of Hardeman, Tex.*, 124 F.3d 736, 738 (5th Cir. 1997). More specifically, the Fourteenth Amendment protects pretrial detainees' right to medical care and to "protection from known suicidal tendencies." *Baldwin v. Dorsey*, 964 F.3d 320, 326 (5th Cir. 2020) (citing *Garza v. City of Donna*, 922 F.3d 626, 632 (5th Cir. 2019)); *Hare v. City of Corinth*, 74 F.3d 633, 639 (5th Cir. 1996) (en banc). A government official violates a Fourteenth Amendment right when the official acts with deliberate indifference to a detainee's serious medical needs. *Id.* "Deliberate indifference is an extremely high standard to meet." *Domino v. Tex. Dep't of Crim. Justice*, 239 F.3d 752, 756 (5th Cir. 2001). To prove deliberate indifference, the Plaintiffs must show that the defendants were "aware of facts from which the inference could be drawn that a substantial risk of serious harm exists," that the defendants actually "dr[e]w the inference," and that the defendants "disregard[ed] that risk by failing to take reasonable measures to abate it." *Hyatt*, 843 F.3d at 177 (5th Cir. 2016) (quoting *Farmer v. Brennan*, 511 U.S. 825, 837 (1994)); *Id.* at 179 (quoting *Gobert v. Caldwell*, 463 F.3d 339, 346 (5th Cir. 2006)).

The Plaintiffs claim that Officer Shafer and LVN Dickerson committed several allegedly culpable acts or omissions: "(1) inadequate screening for a risk of self-harm; (2) failure to provide medical care by failure to provide prescription medication; (3) failure to adequately monitor Rosa

Bonilla; and (4) failure to provide suicide prevention bedding." Plaintiffs claim that there "is overwhelming evidence [Shafer and Dickerson] disregarded an obvious risk of self-harm for Bonilla."

Plaintiffs contend that Shafer knew that Bonilla was "coming down off of [] drugs." This is an inaccurate representation of the deposition testimony. The quoted language comes from counsel's question, not Shafer's answer. Shafer's testimony indicates that she did not believe Bonilla was intoxicated. Here even if true, the fact of Bonilla's intoxication would not indicate that Shafer inferred she was a suicide risk. "[E]vidence that an official was aware of a substantial risk to inmate safety does not alone establish deliberate indifference." *Hyatt*, 843 F.3d at 177 (5th Cir. 2016). Plaintiffs also maintain that Dickerson "ignored the CCQ" search result indicating that Bonilla may have previously received state-provided mental health services. This too is inaccurate; Dickerson notified both the magistrate and the mental health resources center of the possible CCQ match for Bonilla.

Plaintiffs also argue that Shafer, Dickerson, and Jowers relied exclusively on "Bonilla's inherently inaccurate oral responses, while ignoring all objective evidence," in violation of the Facility Operating Plan. Shafer did not disregard the "red flags" in Bonilla's answers; instead she asked further questions until she determined that there was no indication that Bonilla was at high risk of self-harm. Her assessment may have proven incorrect, but her response was not indifferent. Even if Plaintiffs' view of the process could be accepted, evidence of inadequate screening or a violation of facility procedure would not raise an issue of deliberate indifference without additional evidence that the officers or nurses knew that Bonilla was in fact at risk for suicide. *Hyatt*, 843 F.3d at 178 ("[E]ven if an officer responds without the due care a reasonable person would use—such that the officer is only negligent—there will be no liability."). Finally, the report of Plaintiffs'

expert Dr. Kiekbusch "does not support an inference that [Bonilla] was so obviously suicidal that [Defendants] must have known yet disregarded that risk." *Domino*, 239 F.3d at 756. This is especially true given that Dr. Kiekbusch cannot point to evidence of Bonilla's behaving in an erratic or alarming manner in custody nor to evidence that she had any established suicidal tendencies.

This court has previously observed that "[s]uicide is inherently difficult for anyone to predict, particularly in the depressing prison setting." *Domino*, 239 F.3d at 756. In *Flores v. County of Hardeman*, the court determined that the sheriff did not act with deliberate indifference when he took off of suicide watch an inmate who later committed suicide, despite the fact that the deceased had just been arrested after a one-hour standoff with police and "was not acting like himself." 124 F.3d at 738–39. Similarly, in *Sibley v. Lemaire*, the plaintiff offered evidence that jail personnel had "observed [Sibley] holding his Bible upside down while appearing to read from it, cleaning the walls of his cell with toilet paper, lying next to his toilet and staring into it. . . . [and] kicking the door to his cell. 184 F.3d 481, 484 (5th Cir. 1999). Sibley was having a psychotic episode and eventually blinded himself by attempting to remove his own eyes. Nonetheless, the court concluded that "[a]lthough Sibley's actions seem to have become increasingly erratic, nothing he did so clearly indicated an intent to harm himself that the deputies caring for him could have only concluded that he posed a serious risk of harm to himself." *Id.* at 489.

The common thread is a reluctance to hold that generalized evidence of an inmate's mental illness invariably indicates a substantial risk of self-harm. Yet, that is essentially what Plaintiffs argue here. Apart from lacking support in the case law, the proposition lacks logical force, given the varied, individualized nature of mental illness. Bonilla presented with fewer warning signs than either Flores or Sibley. The circumstances of her arrest, booking

and detention did not raise questions concerning her mental stability or capacity for self-harm. She had no history of suicidal tendencies. The evidence indicates that Bonilla did not request medical help, and her behavior in detention was unremarkable prior to her suicide. This evidence did not give rise to reasonable inferences that the individual defendants were aware of Bonilla's suicidal tendency, much less that they disregarded the risk. The district court correctly awarded summary judgment in the absence of evidence that Shafer or Dickerson "acted or failed to act with subjective deliberate indifference to the detainee's rights."

## II. Qualified Immunity

Even if Plaintiffs had been able to thwart summary adjudication of an episodic acts or omissions claim, their claim would still fail because LVN Dickerson and Officer Shafer are entitled to qualified immunity.

"Qualified immunity protects officers from suit unless their conduct violates a clearly established constitutional right." *Hyatt*, 843 F.3d at 177 (citing *Mace v. City of Palestine*, 333 F.3d 621, 623 (5th Cir. 2003)). "Once a defendant asserts the qualified immunity defense, '[t]he plaintiff bears the burden of negating qualified immunity.'" *Id.* (quoting *Brown v. Callahan*, 623 F.3d 249, 253 (5th Cir. 2010)). To do so, Plaintiffs "must adduce facts to show that [Defendants] violated her constitutional rights, and she must show that the asserted "right was clearly established at the time of the alleged misconduct." *Baldwin*, 964 F.3d at 325 (internal quotations omitted). A court may consider either condition first, and if either condition is not met, then the Defendants are immune. *Id.* (citing *Morgan v. Swanson*, 659 F.3d 359, 385 (5th Cir. 2011) (en banc)). To be clearly established, a right must be "sufficiently clear that every reasonable official would have understood that what he is doing violates that right." *Ashcroft v. al-Kidd*, 563 U.S. 731, 741; 131 S. Ct. 2074, 2083 (2011). "When properly applied, [qualified immunity]

protects all but the plainly incompetent or those who knowingly violate the law." *Id.* at 743.

As an inmate, Bonilla had a clearly established right to be protected from her *known* suicidal tendencies. *Garza*, 922 F.3d at 632 (citing *Flores*, 124 F.3d at 738). But Plaintiffs have failed to offer any evidence that Bonilla's tendencies were known to anyone—let alone Defendants; even Bonilla's mother denied that her daughter had ever attempted or expressed thoughts of suicide. Bonilla also had a clearly established right "'not to have [her] serious medical needs met with deliberate indifference on the part of the confining officials.'" *Dyer*, 964 F.3d at 380 (quoting *Thompson v. Upshur County*, 245 F.3d 447, 457 (5th Cir. 2001)). But, as discussed above, Defendants did not treat Bonilla's medical needs with indifference. After Bonilla disclosed her drug use and mental health issues, Shafer made further inquiries into Bonilla's psychological wellbeing. Dickerson sent the required mental health referral and initiated verification of Bonilla's claimed prescriptions. These actions do not evidence indifference. *See Hyatt*, 843 F.3d at 180 ("Although these measures were ultimately, and tragically, insufficient, we cannot say that they constitute deliberate indifference.").

The more specific rights that Plaintiffs claim for Bonilla lack adequate support in the case law to be "clearly established." For instance, Plaintiffs identify no cases establishing a clear constitutional right to adequate suicide screening or to screening only by medical professionals. In *Taylor v. Barkes*, a case involving a factually similar instance of suicide by a pretrial detainee, the Supreme Court observed: "No decision of this Court establishes a right to the proper implementation of adequate suicide prevention protocols. No decision of this Court even discusses suicide screening or prevention protocols." *Taylor*, 575 U.S. 822; 135 S. Ct. 2042, 2044 (2015). The Supreme Court has not revisited *Taylor*. Further, since no "robust consensus of cases" has developed within this circuit on the issue of suicide

screening, there is no basis for asserting such a "right" is clearly established. *Id.*

Similarly, Plaintiffs identify no cases establishing that adequate medical care requires the distribution of prescription narcotics to an inmate within hours of her intake. If Bonilla had exhibited signs of serious physical or psychological distress while detained, the staff's failure to address those needs by providing her with necessary medication may have violated her established right to medical care. *See, e.g.*, *Shepherd*, 591 F.3d 445, 449–50 (5th Cir.) (upholding jury verdict in favor of detainee with chronic hypertension who was denied his prescription medication over several months despite multiple hypertensive emergencies that required medical attention). But Plaintiffs identify no such signs of distress, nor requests by Bonilla for medication.

Plaintiffs rely heavily on *Montano v. Orange County*, but other than featuring the same jail, the case is not sufficiently analogous to clearly establish that Bonilla had a constitutional right to suicide screening or to faster verification of prescriptions. The facts of *Montano* bear little resemblance to Plaintiffs' case. *Montano* did not involve inmate suicide. In that case, jail staff had left a severely intoxicated detainee alone in a cell for over four days, with his own excrement and the food he refused to eat, while they expected he would eventually sober up. 842 F.3d at 870-72. He died of acute renal failure after his calls for assistance went unanswered. *Id.* at 872. Montano had arrived at the jail so intoxicated that he was unable to answer the officer's intake questions, and the officers ignored obvious signs of his physical deterioration over a period of days. *Id.* at 870. *Montano* dealt with neither prescription verification nor suicide screening; Bonilla's condition and behavior were entirely different; and the defendants' conduct here bears no resemblance to that in *Montano*.

As the Supreme Court has warned, courts should not "define clearly established law at a high level of generality." *Mullenix v. Luna*, 136 S. Ct. 305, 308 (2015) (per curiam) (quotation omitted). Thus, the inadequacy of Orange County's response to the distinguishable circumstances attending Montano's death cannot establish the violation of Bonilla's rights. She was checked every 30 minutes and was served and ate a meal. Plaintiffs have not identified a case that would have put Shafer or Dickerson on "'fair notice' that [they were] acting unconstitutionally" when they failed to classify Bonilla as a suicide risk or failed to verify her prescriptions with sufficient dispatch. *Cleveland*, 938 F.3d at 677.

## CLAIMS AGAINST ORANGE COUNTY

Municipalities can be held liable for violating a person's constitutional rights under § 1983. See *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658; 98 S. Ct. 2018 (1978). "[M]unicipal liability under section 1983 requires proof of three elements: a policymaker; an official policy; and a violation of constitutional rights whose 'moving force' is the policy or custom." *Piotrowski v. City of Houston*, 237 F.3d 567, 578 (5th Cir. 2001) (citing *Monell*, 436 U.S. at 694.)

Plaintiffs attempt to predicate liability for Bonilla's suicide on two theories, one derived specifically from *Monell,* and one based on unconstitutional conditions of confinement. This is error. Elsewhere this court has observed that "[u]nder *Monell,* a plaintiff must show either an official policy or persistent and widespread customs. Under [conditions of confinement], . . . the plaintiff must show an intended condition or practice, or show that jail officials' acts are 'sufficiently extended or pervasive . . . to prove an intended condition or practice.' We see no meaningful difference between these showings." *Duvall v. Dallas Cty., Tex.*, 631 F.3d 203, 208 (5th Cir. 2011) (quoting *Hare*, 74 F.3d at 645). Moreover, the standard of causation appears to be same: the policy or custom must have been "the

moving force behind the violation." *Sanchez*, 956 F.3d at 791. Consequently, the failure of Plaintiffs' conditions of confinement claims is fatal to their *Monell* claim.

Plaintiffs assert that two unconstitutional conditions of confinement led to Bonilla's death: "Orange County's customs or de facto policies of oral, self-classification by a detainee of her risk of self-harm, and the effective denial of prescription medication, are extensive and pervasive."

"A 'condition of confinement' case is a constitutional attack on 'general conditions, practices, rules, or restrictions of pretrial confinement.'" *Flores v. Cty. of Hardeman, Tex.*, 124 F.3d 736, 738 (5th Cir. 1997). When a plaintiff challenges conditions of confinement, "the proper inquiry is whether those conditions amount to punishment of the detainee." *Garza*, 922 F.3d at 632. Three elements must be established to prove an unconstitutional condition of confinement:

> (1) "a rule or restriction or . . . the existence of an identifiable intended condition or practice . . . [or] that the jail official's acts or omissions were sufficiently extended or pervasive"; (2) which was not reasonably related to a legitimate governmental objective; and (3) which caused the violation of [a detainee's] constitutional rights. *Montano*, 842 F.3d at 874 (quoting *Estate of Henson v. Wichita County*, 795 F.3d 456, 468 (5th Cir. 2015)).

"[A] detainee challenging jail conditions must demonstrate a pervasive pattern of serious deficiencies in providing for his basic human needs; any lesser showing cannot prove punishment in violation of the detainee's Due Process rights." *Shepherd*, 591 F.3d at 454. This court has written that proving "a pattern is a heavy burden, one that has rarely been met in our caselaw." *Id.* at 452. And "isolated examples of illness, injury, or even death, standing alone, cannot prove that conditions of confinement are constitutionally inadequate." *Montano*, 842 F.3d at 876. Further, a plaintiff

must show that the pattern or practice "was the moving force behind the violation." *Sanchez*, 956 F.3d at 791. When that showing is made, the court "assume[s], by the municipality's promulgation and maintenance of the complained of condition, that it intended to cause the alleged constitutional deprivation." *Flores*, 124 F.3d at 738.

## I. Policy or Custom of Allowing Inmate Self-Classification

Plaintiffs premise their self-classification theory on Shafer's deposition testimony indicating that she evaluated suicide risk was based on Bonilla's answers that she was not considering suicide and that she would be fine without Xanax. Plaintiffs' expert, Dr. Kiekbusch, allegedly fortified their claim because he concluded that Defendants' assessment of Bonilla was based "solely upon Bonilla's assurances that she would be ok . . . and that she would be alright without her Xanax prescription." Dr. Kiekbusch is a Professor of Criminology with "over 20 years experience in correctional administration."

On the contrary, the record does not support Plaintiffs' theory that Orange County has a pervasive policy or custom of allowing detainees to self-classify their risk of self-harm. The evidence relating to Bonilla's intake is not consistent with this theory, Plaintiffs offer no evidence of other detainees who were so classified, and Plaintiffs offer no consistent jailer testimony indicating such a policy.

The suicide screening form directs the interviewing officer to consider factors that are not contingent on the detainee's accurate self-reporting. For instance, the form first requires the officer to answer the threshold questions whether the inmate is able to participate in the interview, and whether the officer has received information from outside sources, such as the arresting officer, indicating that the inmate may be at risk of suicide. The questionnaire directs the officer to observe whether the inmate shows signs

of depression, intoxication, disorientation, unusual behaviors, etc. Orange County requires corrections officers to complete training on how to recognize and interpret the signs of mental illness that an inmate may manifest during such an interview. Thus, the training provides officers with some objective framework for assessing whether the inmate they are interviewing presents a serious risk of self-harm. The jail personnel deposed in this case were virtually uniform in their testimony that staff assess an inmate's potential mental health issues on a holistic basis, which, in addition to the inmate's self-reported answers, includes an assessment of the inmate's physical appearance, behavior, and affect.

Plaintiffs fault Shafer for placing any weight at all on Bonilla's self-assessment that she would not become ill without swift access to Xanax. Whether it was advisable for Shafer to give Bonilla's answer any weight or not, Shafer's testimony and her notes on Bonilla's screening form make it plain that Shafer did not rely on these answers alone when she determined whether Bonilla posed a risk of self-harm or needed immediate medical attention. Shafer's contemporaneous observations indicate that Bonilla was not visibly impaired, nor was her behavior unusual. These observations were enhanced by Shafer's direct interaction with Bonilla for more than an hour in the waiting area. Further, Shafer consulted with her superior, Sergeant Jowers, concerning these observations before placing Bonilla in a cell.

Dr. Kiekbusch's report does not alter the fact that Orange County corrections officers generally, and Shafer specifically, consider more than an inmate's subjective self-assessment in determining whether she is at imminent risk of self-harm. The expert's report and supporting affidavit merely repeat Plaintiffs' fundamental, but incorrect, assumption by concluding that "[i]n relying *solely* on Bonilla's reassurances, Shafer *disregarded* well known suicide risk indicators." (Emphasis added). These are conclusions the record does not support.

No. 19-41039

Plaintiffs alternatively contend that Defendants' decision not to classify Bonilla as a suicide risk violated the jail's Facility Operations Plan, and in so doing demonstrates a policy or pervasive pattern of disregarding the Plan. The language Plaintiffs cite is found under the subheading "Training" and states in relevant part that "[u]pon initial employment and on an ongoing basis, staff shall be trained on the provisions for recognition of mental disability, mental illness and/or potentially suicidal tendencies." Plaintiffs read this language to contend that the Operations Plan "classifies a detainee [] with 'mental disabilities' or 'mental illness' as the same level of risk [] as potentially suicidal tendencies." As a result, Bonilla's mental health diagnoses required Defendants to treat her as a suicide risk, provide her with suicide-proof bedding, and observe her every fifteen minutes.

This is a plain misreading of the Operations Plan, which uses the "and/or" conjunction to indicate that the listed mental health categories are related but distinct from one another. The provision says nothing specific about the risk classifications required for any of these categories, and it does not mandate a uniform response whenever an inmate presents with a condition covered by one of the listed categories. The Operations Plan did not require the Defendants to treat Bonilla as a suicide risk simply because she disclosed certain mental health diagnoses. Consequently, their failure to classify Bonilla as a suicide risk does not evidence any violation of the Operations Plan, much less such a pervasive custom of violating the Plan that would be required to impose liability on the County.[1]

Plaintiffs again rely heavily on this court's 2016 decision in *Montano v. Orange County* to support their claim against the county. But apart from

---

[1] County liability also fails because even if there were a custom of violating the Operations Plan, that custom would itself have to be shown unconstitutional. In the preceding section, however, we rejected such a claim.

the fact that the Orange County jail facility was at issue in both cases, *Montano* bears little resemblance to Plaintiffs' case.

Nor is *Sanchez v. Young County* applicable here. 956 F.3d 785 (5th Cir. 2020). In *Sanchez,* a female detainee's husband called the jail three times and claimed to report that she was suicidal. *Id.* at 788. Further, the detainee had been discovered with an empty bag of pills, which should have led officials to at least suspect a suicide attempt, rather than simply wait for her to sober up before finishing the suicide screening form. *Id.* In *Sanchez*, therefore, the court held that there were issues of material fact as to whether the County had a de facto policy of failing to monitor and assess pretrial detainees' medical needs. Here, there are no such issues. In addition to a wealth of evidence cited above, Bonilla's conversation with her boyfriend gave no indication that she was suicidal. Officer Shafer did conduct a CCQ inquiry and prepare a suicide risk form. Bonilla was able to give apparently complete, coherent answers to Shafer's intake questions and showed no signs of intoxication.

## II. Policy or Custom of Unreasonably Delaying Prescriptions

Plaintiffs base an alleged county policy of delaying inmate prescriptions theory primarily on two items: Sheriff Merritt's testimony that "there is no time limit" within which the medical staff on duty must verify a detainee's prescriptions; and Bonilla received no medication during her time in detention. The argument focuses almost exclusively on Bonilla's Xanax prescription. However, Orange County's official policy is to "NOT refuse ANY medications prescribed to an inmate by a physician." Nevertheless, before giving an inmate a medication, nursing staff must confirm "the inmate is prescribed the medication in accordance with local, state, and federal regulation." Bonilla stated during intake at the jail, and her mother would later testify, that Bonilla had a valid prescription for Xanax, despite the

suspicious circumstances of her arrest. No prescription is in the record, however, and the jail never verified it.

LVN Dickerson began the prescription verification process within a few hours of Bonilla's arrival. Because the pharmacy apparently did not return her call, she left a note for the LVN on the next shift to finish the job. These facts show that the county had no de facto policy of denying or withholding prescriptions, and Plaintiffs offer nothing else.

Further, Bonilla cannot meet the causation element for a conditions of confinement claim. There is no evidence that Bonilla ever asked the officers for Xanax, or any medication, despite having multiple conversations with both Shafer and Lewis. Plaintiffs allude to testimony by Bonilla's mother that an unidentified inmate heard Bonilla "screaming" for her medication, but this is not competent evidence capable of creating an issue of fact.[2] There is also no competent evidence that Bonilla suffered symptoms of withdrawal while in custody. Bonilla stated that she had already taken Xanax that morning before being arrested. There is also no evidence indicating how often Bonilla needed to take Xanax or how long it would be before she began to experience withdrawal symptoms. In short, there are crucial gaps between the Defendants' failure to provide Xanax and Bonilla's decision to take her own life. A jury would have to resort to impermissible speculation to conclude that there was a "direct causal link" between the alleged constitutional violation—Defendants' failure to distribute Xanax to Bonilla during her 10-hour stay—and her death. *Fraire v. City of Arlington,* 957 F.2d 1268, 1281 (5th Cir. 1992) (*citing City of Canton*, 489 U.S. 378, 387; 109 S. Ct. 1197, 1204–05 (1989)); *Oklahoma City v. Tuttle*, 471 U.S. 808, 823;

---

[2] The deposition excerpts in question indicate that this testimony is double hearsay from an unidentified source that cannot properly create a genuine issue of fact at summary judgment. *See Bellard v. Gautreaux*, 675 F.3d 454, 461 (5th Cir. 2012).

No. 19-41039

105 S. Ct. 2427, 2436 (1985)) ([A] "direct causal connection must exist between the policy and the alleged constitutional deprivation. This connection must be more than a mere "but for" coupling between cause and effect.").

## CONCLUSION

There is no genuine issue of material fact and Defendants are entitled to judgment as a matter of law. We **AFFIRM** the judgment of the district court.